We'll hear United States versus Sanchez with Mr. Lee and Mr. Williams. You have a busy day ahead of you, it looks like. Okay, let's see. Judge Briscoe and Judge McHugh, are you all ready? Yes. Okay. Mr. Lee. Morning, Your Honors. Josh Lee for Appellant Daniel Sanchez. Mr. Sanchez's brief focuses on two primary issues. First, that the district court erred by failing to sever Mr. Sanchez's case from that of his co-defendants. And second, that the district court erred by allowing the jury to hear about Mr. Sanchez's prior bad acts. Now I'm happy to talk about either of those issues, but I'll start with the severance issue unless the court tells me it's more interested in the other one. I mean, the severance issue. I think your primary point is that there were statements that were entered against the co-defendants that were detrimental to Mr. Sanchez. And I want to know, you're talking about the witnesses who actually testified, not the recordings. Is that, am I correct about that? Let me make sure I understand the question. I am talking about the recorded statements. Okay. Number one, that Mr. Sanchez was prejudiced by the recorded statements, but there were also recounted statements that the witnesses described. So there were both categories of those things. Okay. Focusing on the recorded statements, my understanding is that they redacted from those statements, references to the other defendants. Am I correct about that? They redacted explicit references to Mr. Sanchez, right? They, they, what they missed too. There were two that got in, there were two, uh, there were two recounted statements that mentioned Mr. Sanchez explicitly in by name. And those were, um, the direct accusations of Mr. Sanchez by name were, um, a government witness recounted a statement from Carlos Herrera, where he said he and Mr. Sanchez had the say-so in this matter, that they reviewed the paperwork and confirmed it was legitimate. Then they gave the go ahead to proceed with Mr. Molina's murder. There was also a statement that the jury received from co-defendant Rudy Perez, where he says that he gave the shanks to Daniel Sanchez and Mario Rodriguez for the Molina murder. Now there's also, uh, you know, ubiquitous problems with the recorded statements to the extent that even though they did not explicitly mentioned Mr. Sanchez by name, they nevertheless undermined his defense by corroborating what was otherwise dubious government informant testimony. So if you'll remember the government's informants said that the Molina murder was a gang hit based on paperwork that served as an order to kill him. Now, Mr. Sanchez's defense was the informants are lying. The killing could have been personal. And this paperwork was fictional. Now, as to Mr. Sanchez, the only legitimate evidence that the government had were these dubious informant testimony. But the recordings corroborated this informant testimony and undermine Mr. Sanchez's defense. So I have a couple of examples of these, um, government exhibit 176 was a recording of Rudy Perez, where he said, I only contributed the shanks for Mr. Molina's murder because I was convinced that it was a quote justified move for the family and not a personal matter. So that completely undermined Mr. Sanchez's ability to argue that no, this was a personal matter. Another example, um, is a government exhibit 194 where Carlos Herrera said, I saw this paperwork that Mr. Sanchez is denying existed. I saw it and it was legitimate and quote, all of us made the decision that this Now, Mr. So here you're here. You're these exhibits you're talking about. These are recordings. These are recordings. And that's an important point. These, uh, these two exhibits and, you know, I could go on and on for hours about similar recordings. Um, and that's important. Um, for two reasons. The first is that unlike the government informants who were the only legitimate evidence against Mr. Sanchez, these recordings of the co-defendants were not subject to the overwhelming impeachment that Mr. Sanchez had of the government informants. A second point, um, it's important to keep in mind why these recordings were so unfair to Mr. Sanchez. And that is that this co-defendant hearsay had a superficial air of reliability. Um, the jury would have perceived it as reliable, but it wasn't actually reliable because Mr. Sanchez had no ability to test it via cross-examination. And in fact, he really had no ability even to test the informants who, um, uh, who laid the foundation and relayed the hearsay because ostensibly it wasn't even admitted against Mr. Sanchez. Well, well, but you, you do have. And the trial is filled with cross-examination of the individuals that testified. And I would say it is a de minimis statement to say that everyone looked pretty bad once they were cross-examined and probably would lead most jurors to pause, whether they should be believed. A hundred percent. And that's why this hearsay was so damning because, um, Mr. Because you got to remember the recordings were of all three of Mr. Sanchez's co-defendants, Rudy Perez, um, uh, Carlos Herrera and Anthony Baca. Those people were co-defendants. They were not government informants. They were not impeached. So what you have is the government has gotten in evidence that is not subject to the impeachment that Mr. Sanchez otherwise used to, you know, really undermine the government's case. Um, so the district court thought, look, okay, the government has presented hours and hours of hearsay, um, across 15 days of the trial, but I can just give a limiting instructions and tell the jury not to consider it against Mr. Sanchez. But, um, I've gone through in my briefing, uh, tons of reasons why in this particular case, the limiting instructions were inadequate. Um, I've cited five cases in my briefing to support the proposition that limiting instructions may not be sufficient where the joinder causes the jury to hear evidence that's legally admissible against the defendant, but is nonetheless logically probative of that defendant's guilt. And this is, I think, Mr. Lee, with regard to those cases, New Orleans case, I think all five of the cases that you're talking about where, where the conspiracies were disparate. There wasn't, um, the, the, the, the problem with, with joinder in the need for severance was because the evidence was going to be admissible, was going to be probative with regard to an unrelated conspiracy, you know, for example, with Warren who committed excessive force, the two co-defendants, uh, were, were involved in a much more inflammatory, much more involved conspiracy of a, of a cover up here. The difference I think arguably is that all of the defendants were involved in a single conspiracy to kill Melina. Um, I don't think it's true that all of the cases I've cited dealt with disparate conspiracies. Um, in Davidson, for example, the sixth circuit case, um, both Davidson and his co-defendant were charged in the same drug conspiracy. Um, in blunt, the third circuit case, um, a husband and wife were tried together for conspiring to defraud the government. Now, um, in that case, there was rather a unique, um, issue that played in, which was the spousal privilege and that she couldn't advance the defense. Um, in, in the joint, if by advancing her defense in the joint trial, she necessarily was damning her spouse, but if you tried them separately, she could have asserted her spousal privilege. So I find that to be kind of sui generis. I don't think it is. Um, I'm not, you know, I don't think my case turns on that one, but the point is in both cases, the joint trial. Cause the jury to hear exceedingly prejudicial evidence that it otherwise would not have hurt. Now I think it's important in the blunt case, the court did not reverse because the wife could not present her defense. The wife did present her defense. The husband was prejudiced by the wife's defense. And here we have, we have the same thing. Um, Mr. Sanchez is prejudiced by all this evidence that the jury would not have heard, but for the jointer. Um, but I think that, uh, there are other reasons besides these four cases that are really specific to Mr. Sanchez, that the court should be engraved out that these limiting instructions were efficacious. Um, and one of them is just the sheer quantity of the inadmissible hearsay and the sheer number of the limiting instructions that were required. So there's a case that I talk about in both my opening brief and my reply brief, the 11th circuit's decision in United States versus one parcel, um, where the it's not realistic, realistic that the jury is even going to remember, um, which statements that acquired from hearsay and which bits of information that acquired, should we look, should we look at the final jury instructions that were given before the jury retired? Does that help? Does that help clear this thing up? Because I appreciate what you're saying with this many limiting instructions as the case and trial is rolling along. It's pretty hard for a juror to remember who said what to who and who they could rely on. But at the, in the final instructions, the court said only rely on those recordings that dealt with that individual who was the subject of those recordings. Does that help? I don't think that it does because again, we have, we don't know that the jury is going to remember what bits of information that were quiet, it acquired from who, and also the recording, the recording would say, say, you know, uh, I'm talking about the hits of Molina and Sanchez made the calls, he arranged who was going to get the knife, et cetera. Okay. You know who the subject of that recording is. It's Sanchez. That's my point. Yeah. The problem though, is that there are just hours and hours of these things. So the jury is not going to go back, um, in deliberations and review these recordings for 20 days. Um, uh, another problem is even if the jury could remember where it got the bits of information from, it still would not be able to follow the limiting instructions, no matter how hard it tried. And that's because what these recordings went to was the credibility of the government's witnesses. And given how implicit and subconscious credibility determinations are, it's not realistic, um, for the jury to disregard evidence that shows the informants are telling the truth when they're trying to decide whether the informants are telling the truth. Basically what the district court's limiting instruction asked the jury to entertain is that the exact same testimony from the exact same witness on the exact same matter was truthful for the purposes of Carlos Herrera's case, because there was corroboration and a lie for the purposes of Daniel, Daniel Sanchez's case, because there wasn't permissible corroboration. And that's just solve that problem, however, by sitting multiple juries. And when he broached that possibility, Sue Esponte, uh, your, your predecessor for Mr. Sanchez said he did not want to do that, that it would prolong the trial. It would create logistical difficulties. And so talk persuaded judge Browning not to do that. So judge Browning then arguably was put in a Hobson's, had a Hobson's choice. He could either completely disrupt his schedule, postpone trial two, et cetera. Um, or, uh, or, or undergo this problem that you're identifying. I don't think that's quite right. Um, Mr. Sanchez opposed the particular two jury proposal that the district court advanced because it still placed him on trial with Anthony Baca. And there were tons days worth of recorded statements from Anthony Baca that were not admissible against Daniel Sanchez. And the whole point was he didn't want his jury to hear those statements. So I'll give you the problem that you're identifying and that is credibility is not something that you can separate. If Duran is, is credible with regard to Herrera, but not that problem would have been solved by having a multiple jury set. Correct? No, because the district court had, um, one jury, the district court's proposal was not for four jurors. It was for two jurors and Mr. Sanchez's jury would hear his jury would hear all of the statements from Anthony Baca. And that's what Mr. Sanchez said is you're not solving the problem because you're still my jury to hearing these statements from Anthony Baca. And so these statements you're talking about are the ones that have to do with the assassination plot. Is that what you're referring to? No, there were also recorded statements from Anthony Baca that had to deal with the Molina murder. So I can give, I could give you one example where Anthony Baca said the administration didn't listen to me and now they have a body on their hands. And in context, it's obvious he's referring to having called the Molina. Um, and I see my time is out. Um, thank you. Um, I'd ask the panel to indulge me for, I'd like to get into the 404 B prior bad acts with respect to Mr. Sanchez. Is that all right with you? Judge Bacarach. Oh, you bet. Um, so I want to turn to the, um, the assaults, the 2005 assault evidence that came in against, um, Mr. Sanchez. And as, as I understand the government's argument, first of all, this isn't a 404 B argument at all because it was intrinsic, not extrinsic, meaning it was offered to prove the existence of the enterprise. And so the issue is a 404 three issue and that you did not argue the, you did not make the argument you're making now before the district court, which is that it doesn't have, it has nil value because there were, you know, reams and reams of, um, evidence available about the enterprise without introducing that. Um, and can you, can you address that for me? Yes. The government is asking way too much of an evidentiary objection that what Mr. Sanchez did is he said, I object to these exact acts that were challenging on appeal. The basis for my objection is rule 403. I'm identifying the particular policy concern in rule 403 that I'm relying on, and that's unfair prejudice. And the species of unfair prejudice I'm concerned about is character propensity prejudice. And that prejudice is going to substantially outweigh any probative value of the evidence that the government might identify. Now I have expounded on that in my appellate brief. There's no question about that, but there's also no requirement that trial counsel submit what's effectively an appellate brief in the trial court. It's enough that he objected to that evidence and identified the specific ground that he relied upon. Well, I guess the argument is that when, when it was raised with the district court, um, it, there wasn't an argument to the district court that the value of this evidence for proving the enterprise should be discounted because of all this other evidence that's already come in. I think that that came, that that is part and parcel of Mr. Sanchez's assertion that the probative value was low because this court's cases say that what probative value means is a comparison with other evidence. And so Mr. Sanchez was invoking a comparison with other evidence when he said that the probative value is not going to come anywhere close to the prejudicial effect. I think it's also important that the district court was well aware by the time that it ruled on Mr. Sanchez's 403 objection of all of the alternative evidence that the So this was not a mystery to the district court. And that's why I think we didn't need to. But you still have to, you still have to provide the district court with the theory that you're arguing. I mean, we, we know that on appeal, you can't shift theories. We didn't shift theories. We said that there is an impermissible character propensity that arises from the evidence and that that outweighs the probative value of the evidence. And that's exactly what that that's exactly what we've argued on appeal. You know I can submit to the court. I debated doing this earlier. But there's a recent decision from this court called McIntosh that I'll submit after argument that says when an appellate brief presents a claim in greater detail than it was presented below, that does not mean that it was forfeit. Um, and I think that's essentially what we have here. Thank you. All right. If you do present that in a 28 J letter, if you can do that without argument within five days, uh, judge Briscoe, did you have any follow up? No, thank you. I did want to ask you, uh, I have a follow up question if you don't mind, Mr. Lee. Um, when you say that it wasn't forfeited, say it in this Macintosh case or the like, I'll try to make this question concise. So you hang your head on judge Holmes footnote, I think 16 in Watson, where he quotes, I think it's Weinstein. You know, it doesn't, you know, I think that that's classic dicta. You know, he doesn't refer to any alternative evidence. Um, he cites a treatise for that and you say, okay, well I presented that argument. On the other hand, we are reviewing judge Browning's exercise of discretion. There was no stipulation that the enterprise element had been satisfying. So what did judge Browning know at the time that he was exercising his discretion, he knew that the government had the burden to prove beyond a reasonable doubt that there was an enterprise element that would have involved contemporaneous conduct to the 2014 Molina murder. Um, and you say now with the benefit of hindsight, well, hell, he should have known that you really didn't need to present this, all of this evidence. Well, let's say you presented that. Let's say you preserve that argument. Did judge Browning really abuse his discretion by not realizing that, that there was this unidentified, all this unidentified alternative evidence to satisfy the enterprise element that you'd never, you know, signaled to, you know, you never identified to judge Browning. How is it, how could he have abused his discretion by failing to recognize something that you never brought to his attention? Um, this is a crucial point. It was not unidentified. All of the alternative evidence that's described in Mr. Sanchez brief, the district court was aware of because it had been presented to the district court at a pretrial hearing where, uh, there, this, these whole libraries of evidence that, that, uh, the government had from the prison's gang intelligence unit that I described. The district court heard all about that at the pretrial hearing. Um, one more thing in response to your question that you brought up, um, it's important, I think that, uh, the, the evidence of the enterprise needed to be contemporaneous and show that it was a racketeering enterprise, but these assaults that the government proved with regard to Mr. Sanchez, these were nine years old and they were not even racketeering crimes. So, so that's another factor that I think diminishes the probative value of the. Thank you. I do want to ask one, I think last question for me, going back to the severance of the defendants, I know there was, I understand that there was a pretrial motion on severance of counts on the severance of the defendants. How do you, how do you get by 12 B3? Um, because I don't think that there was a pretrial motion on behalf of Mr. Sanchez to sever Mr. Sanchez from trial of the other defendants. There was, there were three. Um, and I'll give you those it's, uh, ECF number 16, 16. This was a motion to exclude the co-defendant hearsay. But Mr. Sanchez asked as an alternative remedy that he be severed from the hearsay declarants, that was a pretrial motion. Uh, ECF 1665 is a memorandum in support of that prior motion, which asked the same thing, exclude the co-defendant statements or sever me. Um, the final one, and then I'll sit down is ECF 1719, which was Mr. Sanchez's opposition to the district court's reconsideration of the two jury proposal, where he said, to be clear, I'm still asking to be severed from all the rest of my co-defendants. So I think that the preservation is not an issue for this claim. All right. Uh, okay. Well, thank you very much. Uh, we'll hear from Mr. Williams, Mr. Williams. I'll give you an additional minute again. You don't have to use it, but it's yours if you want it. Thank you, Richard Williams for the United States. So starting where y'all left off, um, we would argue that, uh, it was not preferred, not preserved, that there was no motion to sever defendants that was ever filed by Mr. Sanchez, that rule 12B3 is clear that such motions needed to be filed. Uh, pretrial, um, if not, then good cause must be shown. Um, uh, don't we have what council's just told us, uh, there were motions perhaps captioned in other ways, but the alternative remedy was severance. And the, the, the argument in, in those, um, was the constitutional arguments. Um, below Sanchez argued one, a motion to sever counts six and seven. And two, the motions in limine referenced earlier to exclude the statements and the arguments relating to the exclusion of the statements were all constitutional. They were, uh, one, that the statements were testimonial and covered by Bruton and two, that they were covered by under the fifth amendment and Jackson v. Dino and throughout all of the pretrial litigation, that was the argument that Mr. Sanchez's council pressed. In addition, in the document 1616 motion in limine referenced, um, uh, Baca, excuse me, Mr. Sanchez, um, did ask to sever his trial from Baca, but did not ask to sever it from Herrera. And the argument being made now is that it was largely Mr. Herrera's recorded statements that are those that are, um, prejudicial. So the district court was never presented with the argument that is being made now that under rule 14, it had no discretion, but to sever out Mr. from all three of his co-defendants because of these recorded statements. Um, I recognize the two, um, tested statements that came out in testimony where Mr. Sanchez's name was mentioned, but I would suggest that, um, that is not unusual, um, and that a limiting instruction could have been requested and given at that time, um, but was not, and is certainly not something that would, um, warrant this court now finding, um, an abuse of discretion. Um, so in some, on the preservation point, the district court analyzed severance carefully on numerous occasions, every time it was presented. But the manner in which it was presented was to sever count six and seven from the assassination counts, which were argued to be more prejudicial and sensational, um, and even character propensity regarding the Molina murder. Um, the argument was not made that is being made now. And in those documents, 1616, 1665, and 1719, Zavero regarding rule 14 was not argued. Thus, I'd submit that issue is not preserved. Um, and since it's not been argued, uh, on appeal, uh, or plain error, it's way. Um, what about the, um, the BAD-X evidence? Similarly there, the argument that, um, there was, um, so much enterprise evidence that any additional enterprise evidence would have no probative value was not made to the district court. Uh, as a result, the district court, while it did carefully review many, many, many issues, uh, presented to it and analyze them in detail, um, never analyzed that argument. Um, as a result, it was not preserved and also was waived. In addition, I mean, in, in the legal standard that the district court is applying, doesn't the district court have to look at the evidence in light of all the other evidence that's introduced? I mean, it's part, it's part of the legal standard, isn't it? You don't have to argue to the district court, please correctly apply the legal standard. Do you? I would suggest in this circumstance, it was incumbent upon the defendants to make that argument. Um, because as noted, the jury had to find the enterprise element. That burden was never relieved. It wasn't relieved in opening statement. It wasn't relieved in trial. There were objections early on to enterprise evidence being entered as enterprise evidence. Um, for example, when Mr. Herrera was testifying about a diagram regarding Mr. Baca's plans, um, Mr. Sanchez objected to that. Um, and, and that, and that is true. They had to prove it. But my question is really when the district court is looking at it and trying to figure out whether it's more prejudicial than probative, I mean, part of that standard is when you're looking at its probative value, if it's just more icing on the cake or simply cumulative of a bunch of other evidence that's already come in, that is part of the weighing process naturally. And the district court certainly could have made that analysis, but I would suggest this particular argument was not presented to it, and so it was not a, um, a self-evident ground on which the district court might start excluding, uh, otherwise admissible enterprise evidence. And as a result, um, he, he, the district court didn't address the argument. Um, in addition, I would note that following, um, the second motion in limine regarding the bad acts, um, which is document 1684, uh, in which there was no argument about alternative evidence. Um, there was evidence that was admitted during Mario Rodriguez's testimony on February 7th regarding this assault. And, and it was admitted at that point without objection. Uh, the next time the issue came up was on February 16, when outside the presence of the jury, Mr. Sanchez did object to the 2005 assault, but this time asserting the ground that it was outside the temporal scope. The government responded that it needed to prove the ongoing nature of the excluded on that ground. Um, it was then admitted through the testimony of a corrections officer on February 16th. Um, and then on February 21st, during Eric Duran's testimony, Mr. Sanchez objected again regarding the 2005 assault, but this time he was arguing that the testimony was going to be hearsay, irrelevant, and that it called for a conclusion. Again, he did not assert the 403 alternative evidence argument. And indeed in the court's post, um, trial memorandum of opinion and order, he described Mr. Sanchez's argument as improper character and propensity, um, in which he found that it was not. I cited the Fifth Circuit case, Lewis, because it was the one I found that was most, uh, closely, um, similar to our circumstance here in which a 403 objection was made, but it was not the particular 403 objection that was advanced on appeal and thus not preserved. Um, I would note that the case cited by Mr. Sanchez for preservation, uh, KB trucking involved an exhibit in which the objection, uh, was, was cumulative, um, and the court ultimately decided that it did have probative value, um, and thus I would suggest it does not support, um, preservation. If it was preserved, how do you respond to Mr. Lee's argument that, um, with or without consideration of this avalanche of other enterprise evidence, this was something that did not satisfy the contemporaneous this requirement because it was nine years earlier. So one of, one of the things the jury had to find was the longevity of the enterprise. That was part of the jury instructions. And so both with respect to, um, this assault and with respect to, uh, Mr. Baca's, uh, 1989 murder, those were relevant to prove the enterprise because they proved that the S and M was an ongoing enterprise with sufficient longevity to meet the requirement, which the jury had to find. I would submit that the court didn't abuse its discretion, um, in admitting this, this court finds that it was preserved, the government had to prove the enterprise, um, and this evidence, um, was probative to that. I would also argue that even if the district court abused its discretion, which we don't believe it did, that any such error would have been harmless. Um, that it would not have had a substantial influence or outcome or leave one in grave doubt as to such effect, this evidence did not play a central role in the trial. The evidence, uh, wasn't, um, argued during closings. Um, there was significant, um, mention of the credibility of the people who testified against Mr. Sanchez. Uh, and on that point, I would note that, uh, there was ample evidence that the S and M, um, issued a death sentence to people who, uh, cooperated against it. And so unlike in other cases where the, um, potential benefits from the government are, uh, of more paramount concern and evaluating, uh, witness credibility, in this case, there were significant disincentives to testifying at all because of the risk to personal safety that these, um, people, um, faced by coming into court and testifying. And indeed the Molina murder itself was about someone who was believed to have paperwork indicating he was cooperating, uh, with the government and that the S and M then, um, responded. Um, there was abundant evidence against Mr. Sanchez, um, all four of the, um, hands-on murderers in the cell testified to his leadership role and to his role in directing the murder, um, Mr. Um, Cordova, who was in the adjacent pod, the yellow pod, testified that, um, Mr. Sanchez came to him and, um, asked for a shank so that we can hit this fool. Referring to Mr. Molina, um, he also testified to the co-conspirator statement by Mr. Herrera that Mr. Sanchez was going to take care of it. Um, I would suggest that the harmless error, um, cases, um, that are, that are cited, um, by Mr. Sanchez, um, are distinguishable, um, in that again, the evidence regarding the assaults here did not play a central role. Um, moreover, there was significant evidence that, um, uh, Mr. Sanchez was an S and M leader and that there was significant evidence that members of the S and M had to earn their bones by committing, um, acts of violence. Um, and indeed regarding the, um, the, the, the credibility point and, um, impeachability of the witnesses, um, Mr. Montoya actually testified that he decided to cooperate when he found out that Mr. Sanchez had put a hit on him. So, uh, in some, I would submit that, uh, even if this court finds the horrible, um, the 2005 assault evidence, uh, argument was preserved and the court would use its discretion that it was harmless, if the court has no further questions. Judge Briscoe. Do you know? I don't. Thank you, Judge McHugh. Okay. Uh, thank you, Kevin. I think initially he's, I think we've exhausted his rebuttal time. If we, okay, well, thank you both. Uh, um, let me ask both of you a question. It really doesn't pertain to the, to the, um, uh, pellet arguments, but it's something that is, I've been curious about, is there a problem in light of the nature of, uh, of a lot of the arguments, uh, about the fact that these briefs is, as I understand, have not been filed under seal. And obviously there's a lot of discussion about cooperators. Um, is, is that an issue? I defer to the government about that. And, and your honor, um, I didn't really think about that because, uh, everything that's in the brief is, is in the public record already. Um, but, um, if, if, if I, I could, I could, um, consult with my office about whether or not we would wish to have them sealed at this point, but that was the thinking. I, and I'm not suggesting that they should be filed under seal. I really don't know. Obviously there's a covenant of right of access to court material and certainly not wanting to prejudge, uh, uh, an argument that hasn't been raised. I thought it would just be worth asking at least the question. I do want to take the opportunity to thank both of you for your excellent briefing and your excellent arguments. It was just very, very well presented. This matter will be submitted.